McHenry v. McHenry Good morning. May it please the court, Lewis Fisher from Melbourne and Myers on behalf of the petitioner, Dario Morales Garcia. I'd like to reserve two minutes of my time for rebuttal today. In this case, two procedural infirmities interfered with Mr. Morales' rights to fully and fairly communicate his story to the immigration judge, tasked with evaluating his credibility and adjudicating his claims. One, his hearing was inadequately translated. And two, the IJ failed to abide by his obligation to solicit Mr. Morales' explanations for any perceived inconsistencies or implausibilities in his testimony. The BIA then made matters worse with a third error. It either overlooked or ignored Mr. Morales' pro se protestations that translation errors had deprived him of a fair opportunity to be heard before he was removed from this country and from his family. So do you agree that Mr. Morales never mentioned the term, quote, unquote, due process in his argument before the IJ and his brief before the BIA? I do agree that he never mentioned the term due process, Judge Callahan, and I don't think it matters. This Court's precedents are pretty clear that exhaustion is not a formalistic inquiry, and especially for pro se petitioners. I think the test is whether what he said in his BIA brief put the agency on notice, that he was ----  So where in the record would you point me to the record where he put the court on notice? What's the clearest implication of a due process argument in the record? Sure. I'd point the Court to page 24 of the administrative record. In Mr. Morales' pro se BIA brief, he says, quote, he was not given enough time to fully answer questions, and some of his explanations were mischaracterized after translation. For someone who does not speak English and, you know, has no legal training, I think that suffices to put the agency on notice that there's a problem here with the translation. The Court's cases are clear that we don't need legalese. We don't need a citation to the Constitution. We don't need an invocation of the doctrine of due process for exhaustion. How can we tell what the problems with the translation were? In other words, I take it your point is that this is a pro se brief, so he didn't have to identify them. But now you're asking us to find a denial of due process because of a bad translation, and neither the BIA nor us have been posed with what you think the appropriate translation is and why it would make a difference. Yes, Judge Harris, that's right. And I think the flip side of the exhaustion inquiry, if you agree with me that it's exhausted, is that under this Court's precedence, remand is required to the agency for exactly that issue. That's what happened in Dwan, and that case collects a bunch of citations to published authority where this Court has held. The BIA fails to address an exhausted challenge, including due process. Well, but this is a particular challenge. This is translation. And you've got a record. There's a record of the BIA proceedings, I assume, and you've got a client who could say, gee, I said no, and the translator said yes, or something like that. And so I'm trying to figure out, you know, maybe some of the answers were mischaracterized. I don't know. Did they make a difference? What were they? Can I tell from this record? Yes, you can. And I'll address that in one second. Before I do, I just want to return to Dwan quickly to note that was a case about translation error. What the Court did there is after noting there was, you know, after there was an exhausted due process challenge and noting it hadn't been addressed, the Court relied on its precedence, Zagdiak and others, saying the agency is not free to ignore exhausted arguments from a petitioner. And this is exactly the reason, right? So one way, and actually the cleanest, simplest, and most obviously required path to remand here, is giving it back to the agency to address the errors and the prejudice that are in the transcript. But to answer your question, by reviewing the transcript myself, and each time I read it, I see more things that kind of jump out at me as if not outright errors, and there are outright errors, things that are just confusing. The petitioner is clearly confused. They don't make sense. They're unnatural language. There's three kinds of errors that this Court looks to, right? There's mistranslated words. There's unresponsive answers. There's the petitioner's expression of difficulty. All three are throughout the transcript. And in terms of our brief points to one of the most important on page 169 of the transcript, and before I dive into explaining that error, it's also worth noting that since the previous last story, this Court's made clear that it's very difficult to actually identify the exact mistranslated words because we don't have a bilingual transcript here. But even without that, we can see several errors. The most important, in my views, on page 169, as I said, starting with the government's questions, okay, and thank you, in your application you mentioned that you fear this harm pun return because this is what happened to people such as Colonel Lima Oliva, correct? No. The one that really happened this to was the superior officer. Who's the superior officer? Incorrect. Sergeant, superior sergeant is what I said. Who is that person, sir? The two officers that have already been deceased were the superior sergeants or superior officers. So number one, superior sergeant is key here. Sergeant Villanueva was a similarly situated individual who was tortured and beheaded in Guatemalan prison and is kind of the strongest evidence. The agency ignored it. It's the strongest evidence in support of Mr. Morales' fear, and that gets lost. Where is he going to be removed to? Is he going to Guatemala or El Salvador? He designated Honduras as the country of removal. Isn't that where he was ordered? That is where he was ordered to be removed to, and I believe he testified that he believes upon ending up there he'll then be sent to Guatemala. Because he has an outstanding warrant and an Interpol red notice? He doesn't, in the record, he doesn't explain why. I don't think there's an explanation of the basis for that, but that is correct that there's a red notice and warrant, and I don't want to speculate. It's certainly possible that that could be the reason. What's his arrest warrant for? The warrant, it's pretty hard to parse, but what the warrant says is complicity in extrajudicial killing and false testimony. Okay. So can you address the findings by the agency that your client was statutorily ineligible for various forms of relief? Because I'm not sure that the adverse credibility finding bears on those. So I can address those. I'll start with the serious nonpolitical crime bar, and just to skip ahead for a second, I do think adverse credibility is actually entwined with that. So the reason for that is because in the lead case, both parties cite Villalobos-Sura, right? There were three reasons that this court found the test as probable cause to believe a serious nonpolitical crime has been committed. The question is what evidence do you need to establish probable cause, right? Okay. Probable cause, though, admittedly, is a lower bar than substantial evidence. And was it the I.J. here that found probable cause, right? The I.J. did find – Well, the I.J. would have had to find probable cause to sustain that, correct? Correct. And so that being said, there is a lot of circumstantial evidence in the record. I'm not saying that it proves that he's guilty of a serious nonpolitical crime, but there seems to be all of – there's all of the evidence in the record, and it all goes back to the bishops killing, right? So, yes, Judge Callahan, the agency did make a probable cause determination. I'm not sure that it – I'm not sure that I've seen a case that sort of equates – puts probable cause on a scale with substantial evidence, one being kind of like how this court reviews agency findings and one being kind of a substantive burden of proof to establish a claim. Probable cause, you know, is a flexible standard, and the cases we cite in our brief show, it's not a paper tiger, right? It has to mean something. And we can look to Villalobos. Well, there's some pretty serious allegations in here, and, you know, it is wound up with this adverse credibility. But if you, you know, if you look at – you know, part of when you have circumstantial evidence, you can argue it one way, the other side can argue it another way, but like when we get – it's like when there's – and it seems to me that his taking photographs of people, one way to argue it is, you know, he would say, oh, well, I didn't have anything to do with that. Well, he clearly – I think it's fairly undisputed that he was there on some level, whether he – there's different cracks in the argument about whether he took photos or he said he didn't or what this, that, and the other. But, you know, what about the – I mean, the argument is you can say, well, I have nothing to do with anyone being killed, serious nonpolitical crime. But if your job is to identify targets to be assassinated, and, you know, it seems that there is a reasonable inference in the record that he's taking pictures of human rights people to – for other people that, you know, he didn't carry out the assassination. But if you identify people that should be assassinated, that's pretty serious. And taking pictures of people that are human rights advocates is one way to identify the people that they're going after because the bishop fell in that category too, right? So I want to just take a step back. You know, I guess I just – it's sort of like, okay, he admits he's in this group that is clearly – it's what the EMP or the Estado Mayor Presidencial or whatever. It's a bad group. They did a lot of bad things. And it's like admitting that you're in the Nazi party, but you weren't a very bad Nazi. I mean, he's in this group, and this group is doing bad things, and taking pictures of human rights people and identifying them for other people to target them, it seems to me that's one way you can look at this circumstantial evidence, which troubles me. So, yes, I want to address the – I'm going to just strictly stick to the serious nonpolitical crime bar in responding to the sort of description. Well, I guess, but even if he was just found – even if we just decided it on the persecutor bar, you still lose on that, right? Yeah. So I'll take one more step further back, which is – Okay. I'm sorry. I know. I'm going all over the place. But the evidence is basically the same on all of these. I don't think the evidence is the same, and so I think I'll start there. I'll start by distinguishing the persecutor bar and the serious nonpolitical crime bar. The serious nonpolitical crime bar only applies here, right, if the predicate serious nonpolitical crime is extrajudicial killing. That's what the agency found. That's the predicate crime. It's not taking photos. It's not even facilitating them, right? It's actually extrajudicial killing. And the evidence that the agency relied on is very clear. We all agree there's only three things that it relied on, the red notice, the warrant, and the adverse credibility finding. So that's not enough, given the record, given the nature of the warrant, and especially once the adverse credibility finding is overturned, as we argue it should be. In a lot of the cases that you cite on the red notice, there was something wrong in the red notice. Here, there are things you don't agree with, but there's nothing wrong in the red notice. It's their side of the story. Okay. So on the red notice specifically, the Court has made clear, this Court has made clear, that the red notice is, as a general matter, they're basically unreliable. They're only as reliable, even when there are not really problems with them, as the underlying warrant in the country that issued it. And here, if we actually go ahead and look at the underlying warrant at 330 in the record, the underlying warrant here is scant and borderline nonsensical. The only substantive allegation is the conclusory nature of the crime, translated to, quote, extrajudicial killing in the degree of complicity and false testimony. So that single allegation is not enough to establish probable cause, and that's all that the red notice is based on. That's why, like most courts, at least two other circuits have said a red notice alone is not enough. It's basically just a process thing that happens at Interpol based on the existence of a warrant. So all that's left is the adverse credibility finding. But do we know what this means, extrajudicial killing in the degree of complicity and false testimony? I know nothing more about what it means than what it says. In viola basura, part of the reason that that case found probable cause is because you had a more detailed warrant with substantive allegations that the petitioner had admitted was probably based on. Wasn't an extrajudicial killing, like an execution, like we have the death penalty, that would not be an extrajudicial killing, correct? So this was not – it would be a killing that wasn't one where the people went through the process and were ordered by the state to be killed. That's correct. And I think, you know, I.J. made a finding that the killing in question was – constitutes an extrajudicial killing. I don't think we're contesting that. I think we're contesting the fact that there's no possible way to have probable cause that a photographer showed up undisputedly after the fact committed an extrajudicial killing. Assume for a second that your client presented false testimony at the trial. Would that constitute – would that satisfy the extrajudicial killing bar? No, for two reasons. I think, one, that's a different crime, right? The false testimony is basically perjury, and that's not what the agency found here. But the bar is not being the actual killer, is it? So, again, just focusing on serious nonpolitical crime, because there's different doctrine about that in Persecutor Bar. On nonpolitical crime, that's correct. I think the key here, though, is there are, like, substantive elaborations about what a serious and nonpolitical crime are, what those elements, each element means. Those are legal elements. I'm trying to ask you a legal question. I apologize. I'm trying to ask you a legal question. Let's assume for a moment that there was evidence that your client, although not one of the murderers or participating in the murder, was involved in the cover-up, if you will. Would that satisfy the extrajudicial killing bar, or do you think you need more? So, no for a couple of reasons. No, the first reason is that's not what the agency found, so that's not a supportable. As I read the record, the agency found the serious nonpolitical crime was extrajudicial killing. Two, if we think it's. . . Yeah, we all agree there was an extrajudicial killing. Right, but I don't think we all agree that there's probable cause to believe that Mr. Morales committed one by showing up at a rave. That's the question I'm trying to ask. Does the statute require that he be the killer, or can it be satisfied with something less? I don't think the statute has a requirement about that. I think the requirement for that is what's the crime, right? We have to start with the crime. Right, everybody agrees. This is why we're missing each other. Everybody agrees there was an extrajudicial killing. Right. So the question is whether your client is somehow barred from seeking relief because of his involvement in some way in that killing. And I'm trying to figure out what you think the level of involvement that is legally required in order to invoke the bar. I think it depends on the elements of criminal liability in that case. So let's say there's a possibility that there's. . . The criminal law recognizes vicarious liability, including in the context of murder. Right, accomplice liability. Accomplice liability, sure. If he's somehow supposed to take these. . . I'm not clear. He said he didn't take the photographs, and he gave two different reasons for that. But he was supposed to take the photographs, and he was sent there with the group. And did he lie on the stand to cover up the EMP's involvement? I mean, I think that's the question that we're looking at. And in this country, being an accomplice after the fact would subject you to the same level of culpability. We can all agree there's no proof that he actually killed this person. I'm trying to figure out whether or not this kind of subsequent liability, accessory after the fact, or a cover-up, or being involved in trying to throw the authorities off the trail of the correct killers would be enough to satisfy the bar. So three reasons why I think it's not enough here. Number one, the agency. . . First, would it be enough if shown? I understand you don't think it was shown. I don't think I can speak to that, and the reason is because I don't know. . . There's nothing in the record about after-the-fact liability. That's the government's argument on the persecutor bar, and I can talk about why I don't think that's right. But there's no, like, vicarious liability conclusion here. There's no accomplice conclusion. There is an allegation in the red notice. . . Sorry, in the warrant of false testimony. The reason I've been resisting is because it's not clear to me how false testimony, no matter how . . . no matter what the scienter was, the motive, the purpose behind it, could constitute, or that it does constitute, a serious nonpolitical crime, and no one's found that, right? Perjury, I think, could lead to . . . I don't know. I'm not a criminal lawyer, but, like, in this country, it's a serious crime, but it's not on par with murder, and we talked about the serious nonpolitical crime bar. . . To be nonpolitical . . . So if you committed perjury, your view is that that would not meet the serious nonpolitical crime bar? So I think two things. One, the Court can't determine that it is because the agency didn't address it, and it's not kind of our place in this room to determine as a matter of first impression, in this case, what is a serious nonpolitical crime or not. And two, I think substantively it would fail as a predicate. That's why the agency didn't rely on it, because to be a serious nonpolitical crime, it has to meet both of those elements, and to be nonpolitical, it has to . . . Part of what the agency relied on is the fact that the crime was atrocious, so it had to be the killing, right? If it was just the lying, and we didn't really . . . I don't think we really got into this that much, but the nonpolitical character aspect is sort of a . . . It's a flexible standard. The IJA discusses it a little bit, and part of the standard, part of what it relies on is when a crime is so atrocious, it can't be political, right? So even if you could squint at this, and I'm, you know, not trying to, but you could . . . A fascist government that commits a crime, right, can be viewed as political if they're . . . in a sense. But the agency avoided that whole mess by saying, this is an atrocious crime, and that's why the serious nonpolitical . . . And that's kind of, I think, what the rub was, right? That's why it can't be false testimony and arguably can't be accomplice liability substantively, right? Because I don't know that accomplice liability is quite as atrocious, and even if it is, the agency never addressed that. So the only thing that's before this Court is whether there's probable cause for an extrajudicial killing, and I think that's why the bar here is so weak, applying it, that particular one. We can talk about Persecutor next. Well, I think you're . . . Yeah, you're well over. Yeah, yeah, yeah, I am over. Way, way over. Okay, sorry. I've been letting you be over because this case has a lot of issues in it, but I think it's time we heard from the government. Thank you, Your Honor. Good morning, Your Honors. Stephanie Hennis for the respondent in this case. There's a lot going on in this case. I think . . . I would like to start briefly by addressing one thing that the Court has not directly addressed, which is the fact that the petitioner's withholding of evidence  fails on the merits if he can't establish nexus, and that was a determination that the agency found in this case. Does that turn on to credibility determination? It does not. It does not, Your Honor. So the main objection that the petitioner has raised to this determination is that he says that the agency overlooked evidence. He's repeatedly pointed to an Amnesty International, a reference to Amnesty International. It's on page AR-208, and has said that the agency overlooked that when it was evaluating whether the deaths of Mr. Lima, Oliva, and Villanueva were indicative of a nexus. And the IJ specifically acknowledged that page of the record. The IJ acknowledged that Amnesty International feared that the murder may have been orchestrated to remove him as a witness, but credited other evidence saying that he was killed in a prison uprising. So you concede that the IJ was wrong about saying there was no nexus? No. I'm saying that the immigration judge addressed all of the evidence that was presented in this case contrary to what the petitioner is saying. The immigration judge weighed all of the evidence and came to the conclusion that the people that he is pointing to as evidence that others who were involved in this murder are being killed based on their involvement in this murder is not true. If you look at both of those people, they were actually being given serious benefits while they were in prison. Villanueva had been allowed to leave the prison, and one of the reasons for the attack was that the gang members were dissatisfied with the privileges that people like him had been receiving in prison. This assumes the protected ground but finds no nexus. There has to be a nexus. A nexus between a claimed protected ground and the feared persecution. So you're assuming there was a claimed protected ground but no nexus was established. That's what the agency found, that there was no nexus. Okay, now could you return to protected ground? Did the agency assume a protected ground or find one? The agency assumed that there was a particular social group in this case. And you're not contesting that? I'm not contesting. That's what the agency said. What was the particular social group? The IJ identified the particular social group as individuals playing a role in the assassination of Bishop Girardi. So the petitioner has pointed to two other individuals who were actually convicted of being involved in the murder. One, as I have pointed out, was killed for other reasons. That's what the agency determined. And Mr. Lima Oliva, he had actually built a vast, powerful criminal extortion scheme from prison along with the prison director. That's at AR-252. He also had been given extensive privileges in prison. He could leave almost at will. And we know that the attack was planned by a rival inmate who clashed with – There was evidence from which the IJ could have found an absence of nexus, is what you're saying. Exactly. I'm just getting at that is a separate reason that this court can use to deny the petition. Because there's only three forms of relief at issue here, withholding, cat protection, and cancellation of removal. Yes. On cat protection, putting aside whether or not Mr. Morales' testimony was credible or not credible, as I read the IJ's findings, he seems to find that it is not more likely than not that Mr. Morales would be tortured if returned because these other killings occurred for other reasons, if you will. Yes, Your Honor. Is his credibility determination at all bound up in that finding? No, that's also based on the evidence of record. Whether the petitioner is credible or not, the agency can determine that that testimony is not sufficient to meet his burden. And so the agency looked at all the evidence presented and said these other people were not killed based on an involvement in the murder, and therefore he can't meet his heavy burden to show that it's more likely than not that he would be tortured. I'm not sure I can parse the IJ's finding on this. I wanted to ask you, did the IJ make a separate finding about the absence of government acquiescence or was it just that you hadn't shown that torture was probable and therefore I don't need to get to government acquiescence? The immigration judge and the board found both, and the board affirmed that.  They said both. I'm just trying to figure out whether they said it because that's what the statute requires or whether or not they actually separately addressed government acquiescence. They did. And one of the things I would point to there would be the fact that the immigration judge said that there would actually be an incentive for the government to work to keep this person alive. It doesn't really make any sense that the Guatemalan government would acquiesce to someone's murder when they're trying to prosecute them for a high-profile human rights abuse. I do want to take some time to address the complaints that Petitioner has raised about the transcript in this case. And as we pointed out, well, first of all, the Petitioner did not discuss due process in his appeal brief to the board. I recognize that he was pro se. What the board did in this case, however, was acknowledge his claim that there were mistranslations, but said, you know, he hasn't shown what those mistranslations were. And I understand that it can be difficult to show a mistranslation, but the proceedings in immigration court are fully recorded. People can request to listen to those recordings. So there would have been a way to determine whether there actually was some prejudicial problem with the transcript in this case. And then the things that Petitioner continues to point out as problems in the transcript either show that there was a misunderstanding and that there was follow-up questioning that helped to clarify it. I'd also like to point out that part of Petitioner challenging the adverse credibility finding is that he says, oh, I was able to testify consistently in my immigration court testimony. There are no error, there are no inconsistencies within the testimony that I provided in immigration court, which seems to run counter to the notion that there were problems with him conveying the claim that he was trying to raise. And the adverse credibility finding, when you look at all of the different ways that the Petitioner has changed his testimony, it's very compelling. I mean, we have the Petitioner... There are some of them that he doesn't seem to have been confronted with to allow an opportunity to explain. So, for example, arguably Mr. Morales wasn't given an opportunity to explain some of the inconsistencies specifically as to who woke up Mr. Morales to go to the parish house and whether he entered the parish house. So that also the IJ never told Mr. Morales what corroborative evidence was required and never gave him an opportunity to explain whether or not he could obtain that evidence. So what do you say about those things? Starting with the third thing that you pointed out, when a person is not credible, the immigration judge is not required to give advance notice of the need to provide additional information to not find him credible. Those corroboration requirements are for people who are credible and then are taken by surprise when the immigration judge says, you know, you didn't meet your burden of proof. That's not the case here. The issue about whether he went into the parish house is not a situation where he needed to be confronted with the inconsistencies because it's his testimony versus a lot of human rights workers who say that he was, in fact, in the parish house taking photographs. Doesn't our law say that the IJ is supposed to say, other people have testified that you were in them. How do you respond? You know, confront him with the other evidence and say this is inconsistent with your testimony. Do you have an explanation? No, so I apologize, Your Honor. I cite this in my brief. There is a case that says where you are not talking about comparisons of the petitioner's own testimony. It is not a question of explaining an inconsistency. It's a question of the immigration judge weighing the evidence. And here the immigration judge weighed the evidence and found it more convincing that he was, in fact, in the parish house. Did Mr. Morales, was he aware in the hearing that other people were saying were conflicting with his testimony? He was. He had been given all of the information. DHS had served him with all of the information that they were relying on in this case. And at various points during the record, he, part of his claim was that he had no idea about being suspected of involvement in this murder until he received all of DHS's documents and was able to review them and see what was being brought there. But I would, as to being in the parish house, I'd also like to focus on the fact that petitioner makes the argument that he didn't actually go in. He was stopped at the threshold of a doorway. But then you actually have the petitioner in briefing to the immigration judge admitting that he saw, he did not see Bishop Girardi's body because he only saw a body covered by a white sheet. That's at AR 639. That is not, that is not conducive to him claiming that he merely got to the threshold and was not able to go in. He also tries in his appeal brief to the board to discount the statements of human rights workers because he claims that they were not able to enter the house with him. So in his appeal brief, he also seems to admit that he was, in fact, in the house. The, you know, there are impossibilities in the claim as well because the petitioner claimed that he had no awareness that the organization that he had been a part of for 16 years was involved in human rights abuses, but he testified that he knew about the report, the Bishop Girardi's report, as early as 1998. The EMP actually orchestrated high-profile human rights abuses while he was a part of it. He took photos at Villanueva, was also prosecuted and convicted of a separate extrajudicial killing, and there's evidence in the record at 411. So is there evidence in the record that he took photos at another situation of human rights people besides at the priest? Yes, Your Honor. It's at pages 411 to 412. Villanueva, before he was on trial for Bishop Girardi's murder, had also been on trial for another extrajudicial killing, and during that time, the petitioner showed up at the trial that was going on, taking pictures of the human rights workers there and license plates. Can you respond to your colleague on the other side? When I said, okay, on the serious nonpolitical crime bar, that basically it's a... Well, I suppose if either, if the persecutor bar is upheld, it doesn't really matter whether the other one's upheld, right? Either are bars. But on the serious nonpolitical, there would have to be probable cause. You heard what your friend on the other side, why he said there wasn't anything in the record, and I pushed back a little and I said, well, it seems like there's some circumstantial evidence that would be entitled to certain inferences. What's your response on that? I agree with you, Your Honor. I would also like to expand the universe of information that is in the record supporting the applicability of the serious nonpolitical crime bar in this case. So we have the arrest warrant, which does say that the petitioner initially denied being at the crime scene and was later identified as taking photographs at the crime scene. We have him testifying in immigration court that he was at the murder scene before police even arrived. There's also evidence in the record, this is 596-600-603, where he was on duty that night and while the standard practice is to note your entries and exits, he did not do so that night. And at 412 and 615, when he was initially confronted at the murder scene and asked what he was doing there, he told them incorrectly, I am out of time, Your Honor. Go ahead, finish. Well, I'm just curious, what would be a permissible circumstantial inference of someone who's in the EMP that takes photographs of human rights people at murders? What would be a permissible inference for an immigration judge? Why could that amount to probable cause from your standpoint? Probable cause? Well, why would you take pictures of human rights people in an organization like the EMP? Because you wanted to surveil them and target them for murder. Well, is that a permissible inference for the record before us? Yes, Your Honor, and there is actually a lot of background evidence in the record that lays out what the focus of the EMP was while it was purportedly providing presidential security. It was actually an intelligence service. What's the serious non-political... I thought the serious non-political crime here was the murder of the bishop. Well, that is... Is there another serious non-political crime here that sits at issue? No, you're correct, Your Honor. I would like to see, though, that the... So taking pictures of protesters, even for an evil purpose, isn't the serious non-political crime we have here, is it? Well, so that... The questions that Your Honor were asking, I do think, go more toward the persecutor bar. The persecutor bar, absolutely. But the... There wasn't just a... There wasn't a determination that there was probable cause to believe that the Petitioner had actually murdered the bishop. There was probable cause to believe that he had been involved in the murder. That's what the agency said. And for the reasons that I had laid out, all of the evidence in this case that shows the Petitioner being there, lying about it, not giving truthful answers to investigators at the scene of the crime, purporting he's saying he was from a law enforcement office when he was not, in fact, from a law enforcement office, all gets to the notion that there was probable cause here. And I realized there was a question earlier about substantial evidence and probable cause. And so the question before the agency was whether there was probable cause to believe that there was a serious nonpolitical crime committed. But at this point, the Court reviews that for substantial evidence. So the Petitioner would need to show that there is not substantial evidence to support the probable cause determination. And I would point the Court to both Westby and United States v. Valencia, MSUA, that are cited in our brief, that talk about how a vague and implausible story can allow officers to reasonably infer that suspects were lying and that their lies suggested a guilty mind. And a probable cause for arrest can also be established due to proximity to the crime scene and suspicious conduct. And we have both of those in this case, Your Honors. I do realize that I'm out of time. I'm happy to answer any other questions if you have them. Well, I guess, am I completely out of line that it appears that the EMP was portrayed in this record as committing these type of crimes and that taking photographs could be considered as a way to identify targets for assassinations and there is evidence in the record that assassinations were occurring? Yes, and we focused on that for purposes of the applicability of the persecutor bar, which requires only assistance or otherwise participating in persecution. So what Your Honor is saying is correct. Someone who is taking photographs of people that are used to then identify them for harm by the EMP would be a reason to apply the persecutor bar in this case. Okay, thank you. So if we don't think there's enough evidence for the extrajudicial killing bar, that we do think there's enough evidence for the persecutor bar, how does that affect the claims? You would uphold the denial of withholding of removal. The persecutor bar is a statutory bar to withholding of removal. So whether... Withholding and to, for CAT and for cancellation or just withholding only? Oh, so for the persecutor bar does not apply to cancellation of removal. The extrajudicial killing bar applies to cancellation of removal. But that was not the only reason that cancellation of removal was denied in this case. So it was... And that's... Is that reviewable or not? The factual findings from the agency are not reviewable. The court can review for substantial evidence whether the facts found reach the exceptional and extremely unusual hardship standard. And while there are hardship aspects in this case, the petitioner needs to reach a very high standard to warrant cancellation of removal. And what he has pointed to are hardships that are unfortunately consistent with most people being removed from the country and the separation that they would face from their family members. All right. Thank you very much, counsel. Mr. Fisher, I'll give you two minutes because you were very much well over your time previously.  All right. So a lot of ground was covered. Unless the court has specific questions, there are a few things I want to address about the due process. If I raise a new issue, that is no nexus on withholding. Yeah. So on withholding, I think we can zoom in on the nexus issue, right? The agency assumed there was a particular social group articulated. At page 50 of our brief, we sort of, as this Court's precedents permit, like Akesang, we distilled the BIA version of the particular social group to encompass, right, it was people who have been implicated to varying degrees, is what he said before the BIA. But it doesn't mean they assumed a social group. Okay. Assuming it? Take your best social group in the world. The IJ says, looking at this evidence, I don't think the persecution that you fear in the future will, that will, your membership in the social group will be the reason for that feared persecution. Tell me why that's not supported by the record. So I'll point the Court to, the reason it's not supported by the record is because the agency didn't account for the strong evidence that similarly situated individuals belonging to the particular social group, right, which is people who have been associated, witnesses, people who were accused, right, of this crime, that they have been tortured or killed in Guatemala. Both the agency and the government conflate Lima, Oliva, and Villanueva together. Page 81 of the IJ's decision says, Captain Lima, Oliva, and Specialist Villanueva were harmed in prison as a result of power struggles. That's not what the record shows. Page 208 of the record is where there's evidence that Amnesty International, an organization that the government relies on here as reliable, this Court has relied on many times, said they suspect he was killed. Was there any evidence to support, see, it's one thing to say the evidence was stronger on your side. Trying to figure out whether there was any evidence to support the nexus finding by the IJ, because if there was, we don't get to reweigh it. I think, I don't think we can reweigh the evidence, but I think the IJ has to consider and give cogent reasons for any persuasive evidence that it discards, and it didn't. I'll read just what Amnesty said, which is, we fear that Villanueva's murder, this is page 208, may have been orchestrated to remove him as a potential witness against other military higher-ups allegedly involved in the bishop's murder. Against whom proceedings remain open, the organization stated. That's one thing that was never addressed, right? I quoted to you where they conflate Lima, Oliva, and Villanueva together. Lima, Oliva was the one with the gang-related stuff, not this guy. Second, there are other individuals. There's a former witness who, like Mr. Morales, his name's Eric Urizar, had further investigation ordered. He was killed. That's not addressed. There's a man named Mr. Pantaza, who was also approached in prison, asked to kind of make a deal implicating, I think it was, you know, the Catholic Church, and he was eventually killed. And the government's response is, oh, these people aren't in your particular social group. That's why I started there. They are, because implicated, right? The people implicated, it's the people that are involved. You could be, this is, you know, a situation where, just by being virtue of a witness or someone who's had further investigation ordered, right, we're seeing people are killed. And then most notably, I think, this amnesty suspicion that there was, you know, nefarious covering up evidence motivations, right, to have torture and beheading of a similarly situated individual. None of this is addressed with specificity, certainly not given cogent reasons to reject it. So that's the reason. It's not a reweighing of evidence. It's a failure to address it in the first instance from the agency on nexus. All right. Thank you, counsel. Thank you. Morales-Garcia versus McHenry will be seated. And, counsel, I want to thank you very much for advocating, in this case, pro bono and recognize O'Melveny Myers for doing that. Thank you, Your Honor. In my dream last night, I forgot to say thank you to. We appreciate both of you being here, but we especially appreciate that on difficult cases, that pro bono is willing to do the work because it does make deciding these difficult issues, I think, better. It makes it easier for us to see the issues. I concur. I appreciate it. Thank you, Your Honor. Thank you very much. Thank you both.
judges: WARDLAW, CALLAHAN, HURWITZ